United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 17, 2003**

Charles R. Fulbruge III
Clerk

REVISED OCTOBER 8, 2003

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 02-30842**

_____

**OTTO CANDIES, L.L.C.,**

**Plaintiff-Appellee,**

**versus**

**NIPPON KAIJI KYOKAI CORPORATION,**

**Defendant-Appellant.**

_____

**Appeal from the United States District Court
for the Eastern District of Louisiana**

_____

Before JONES and BENAVIDES, Circuit Judges, and KAZEN, District Judge.*

EDITH H. JONES, Circuit Judge:

Appellant Nippon Kaiji Kyokai Corporation ("NKK") appeals from the judgment in a negligent misrepresentation case based on statements NKK made in a classification survey of the M/V SPEEDER that was a prerequisite to the vessel's sale. We hold that general maritime law cautiously recognizes the tort of negligent misrepresentation as applied to classification societies and that

---

* Chief District Judge of the Southern District of Texas, sitting by designation.

on the specific facts presented in this case, NKK owed a legal duty to Otto Candies. Finding no error in the district court's judgment, we affirm.

## BACKGROUND

The SPEEDER is a high speed, aluminum hulled passenger vessel built by Austal Pty Ltd. Diamond Ferry Co., Ltd. ("Diamond") took delivery of the SPEEDER in April 1995. The SPEEDER was registered in Japan and was classified by NKK as a "coastal (Japanese Government) passenger vessel." Diamond operated the SPEEDER as a coastal passenger ferry from 1995 to 1998 in Japan. In 1998, Diamond took the SPEEDER out of service, and her NKK classification lapsed. On December 22, 1999, Otto Candies entered into a Memorandum of Agreement ("MOA") with Diamond to purchase the SPEEDER. As a condition of sale, a clause in the MOA required that NKK restore and make current the SPEEDER's coastal classification free from any outstanding recommendations.

On January 5, 2000, NKK issued a Class Maintenance Certificate to Diamond that indicated the SPEEDER was certified within class as a coastal passenger ferry with no outstanding deficiencies. This condition of the MOA being satisfied, Otto Candies paid for the SPEEDER and it was transported from Japan to Port Everglades, Florida aboard a heavy lift ship. From Port Everglades, the SPEEDER was towed to the Bender Shipyard in Mobile, Alabama. Once the SPEEDER arrived in Mobile, Otto Candies arranged for a survey by the American Bureau of Shipping ("ABS") so that the

2

vessel's classification could be transferred from NKK to ABS.

The ABS surveyor, Demetri Stroubakis, discovered a number of significant deficiencies that required repair before ABS would classify the SPEEDER. In particular, Stroubakis noted damaged and wasted overhead spool piping sections that connect the cooling system machinery to the hull; a hull fracture in the port-aft main-engine exhaust connection to the hull; fractured hull brackets, wasted cooling piping, leaks in the port and starboard stabilizer fins; excessive movement in the starboard stabilizer shaft; leaks in the port-forward main-engine sea strainer that filters the water used to cool the engines; disconnected and missing bilge pumps; gas and water leaks in the exhaust system; a faulty circuit breaker for the starboard generator; severe damage to the port-aft main propulsion gear; exterior and interior leaks in the main reduction gear oil coolers; damage to the starboard-forward main engine; damage and deterioration in the ventilation system for the port-aft engine; corroded hose and pipe connections for the main and auxiliary engine fuel and lube oil systems that created a severe fire hazard; leaking water-jet pump shaft seals; a heavily corroded port and starboard water-jet pump-bladder accumulator-block valve; and that the engine oil was sooty, black, and contained particulate matter which suggested problems with the machinery. In response to Stroubakis's report, Otto Candies had the SPEEDER repaired at the Bender shipyard at a cost of $328,096.43. When repairs were completed, ABS issued an interim class certificate.

Otto Candies filed the instant suit against NKK to recover the costs of repairs needed for the SPEEDER to obtain a class certificate from ABS. Otto Candies's sole claim against NKK was based on the tort of negligent misrepresentation as stated in the ALI Restatement (Second) of Torts § 552. The district court held a two day bench trial, after which it found that NKK owed a duty to Otto Candies and that NKK was liable for negligent misrepresentation. The court awarded Otto Candies damages for the repair costs. NKK timely appealed.

**STANDARD OF REVIEW**

In admiralty cases we review the district court's legal conclusions de novo. Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV, 199 F.3d 220, 223 (5th Cir. 1999). We review the district court's factual findings for clear error. Houston Exploration Co. v. Halliburton Energy Servs., Inc., 269 F.3d 528, 531 (5th Cir. 2001) (citing Fed. R. Civ. P. 52(a)). Findings of negligence are factual findings. Jackson v. OMI Corp., 245 F.3d 525, 528 (5th Cir. 2001). "Under a clear error standard, this court will reverse 'only if, on the entire evidence, we are left with the definite and firm conviction that a mistake has been made.'" Walker v. Cadle Co. (In re Walker), 51 F.3d 562, 565 (5th Cir. 1995) (quoting Allison v. Roberts (In re Allison), 960 F.2d 481, 483 (5th Cir.1992)).

4

**DISCUSSION**

NKK is one of the world's largest maritime classification societies. Classification societies are "organized societies which undertake to arrange inspections and advise on the hull and machinery of a vessel from its initial stages in new building and thereafter. The societies produce a certificate concerning the vessel's seaworthiness in accordance to the trade within which it is intended to, or does, work." Damien L. O'Brien, The Potential Liability of Classification Societies to Marine Insurers Under United States Law, 7 U.S.F. Mar. L.J. 403, 403 (1995) (quoting Eric Sullivan, The Marine Encyclopedia Dictionary 78 (1980)). These certificates are widely relied upon by all sectors of the maritime industry as an indication that a vessel is reasonably fit for its intended use. Machale A. Miller, Liability of Classification Societies from the Perspective of United States Law, 22 Tul. Mar. L.J. 75, 77 (1997); Hannu Honka, The Classification System and its Problems with Special Reference to the Liability of Classification Societies, 19 Tul. Mar. L.J. 1, 3 (1994) (noting that "certificates are important not only to insurers, but also to charterers, cargo owners, buyers, and bankers, among others, who are required to know the ship's condition at a specific time").

Citing a previous decision of this court, the parties assumed that NKK can be held liable under general federal maritime law for the tort of negligent misrepresentation. Coastal (Bermuda)

Ltd. v. E. W. Saylott & Co., 826 F.2d 424 (5th Cir. 1987).[1] It is true that Coastal (Bermuda) applied the principles of Section 552 of the Restatement (Second) of Torts to a cargo purchaser's damage claim against a petroleum products surveyor, and reversed a judgment for the purchaser, but that ruling does not automatically translate to the relations between maritime classification societies like NKK and their clients or third parties. Indeed, this court earlier reversed and remanded a case to ascertain what duties a classification society may owe its shipowner clients, in contract or tort, for negligent inspection of a damaged ship. Gulf Tampa Drydock Co. v. Germanischer Lloyd, 634 F.2d 874 (5th Cir. 1981).

A handful of cases in other jurisdictions has explored the duty of classification societies, yielding one definitive court of appeals holding that a classification society cannot be liable in contract or tort to a shipowner for a negligent survey regarding vessel seaworthiness. Sundance Cruises Corp. v. The American Bureau of Shipping, 7 F.3d 1077 (2d Cir. 1993). The court noted that "a shipowner is not entitled to rely on a classification

---

[1] The parties assumed, and so do we arguendo, that general federal maritime law, not state law, applies to this case. This is because we normally do not address choice of law issues sua sponte. Am. Int'l Trading Corp. v. Petroleos Mexicanos, 835 F.2d 536, 540 (1987) ("It is well established that 'parties generally are bound by the theory of law they argue in the district court, absent some "manifest injustice."'") (quoting Shelak v. White Motor Co., 581 F.2d 1155, 1160 (5th Cir. 1978)). Since the district court's jurisdiction in this case is based upon the diversity of citizenship of the parties pursuant to 28 U.S.C. 1332 (2000), whether this tort arises under general maritime law or state law does not affect jurisdiction.

certificate as a guarantee . . . that the vessel is soundly constructed." 7 F.3d at 1084. The shipowner, not the classification society, must remain ultimately responsible for the ship's condition.

With respect to an injured third party "who relied on the classification or safety certificates," however, the Second Circuit suggested a different result might obtain.[2] In cases before and after Sundance, parties have sought to recover from classification societies after they suffered loss or damage allegedly attributable to defective classification certificates. One case from the Southern District of New York assumed arguendo, following the Sundance dicta, that a maritime claim for negligent representation exists against a classification society on behalf of cargo owners. Cargill, Inc. v. Bureau Veritas, 902 F. Supp. 49 (S.D.N.Y. 1995). In Cargill, the cargo owner lost, because there was no evidence that it actually relied on the classification certificates. In another case, a classification society was held liable for negligent misrepresentation to a ship charterer for whose benefit it furnished an incorrect Suez Canal special tonnage certificate.

---

[2]  A year later, the Second Circuit held an independent hold inspector liable, as a matter of contract, not tort law, to its client Cargill for defectively certifying the condition of a ship's hold for the carriage of Cargill's fertilizer. The court distinguished the purpose of the hold survey from that of a classification certificate to a shipowner, the latter being intended "merely to . . . take advantage of the insurance rates available to a classed vessel." International Ore and Fertilizer Corp. v. SGS Control Services, Inc., 38 F.3d 1279, 1285 (2d Cir. 1994), quoting Sundance, supra, 7 F.3d at 1084. In Coastal (Bermuda), by contrast, the plaintiff was a third party to the fuel oil inspection report prepared by Saybolt for the cargo's seller, rendering tort principles applicable.

The certificate was used, *inter alia*, to calculate fees for passage through the Suez Canal. <u>Somarelf v. The American Bureau of Shipping</u>, 720 F. Supp. 441 (D.N.J. 1989). The theory behind this case predates, but is consistent with the court's *dicta* in <u>Sundance</u>.

The district court's adjudication of liability against NKK therefore moves this court into novel but not entirely unchartered territory. Although the verdict was appropriate in this case, we emphasize that a claim for negligent misrepresentation in connection with the work of maritime classification societies should be strictly and carefully limited. The societies' surveys and certificate system are essential to maintaining the safety of maritime commerce, yet their activities should not derogate from shipowners' and charterers' nondelegable duty to maintain seaworthy vessels. Imposition of undue liability on classification societies could be harmful in several ways. The societies could be deterred by the prospect of liability from performing work on old or damaged vessels that most need their advice. The spreading of liability could diminish owners' sense of responsibility for vessel safety even as it complicates liability determinations. Ultimately, broader imposition of liability upon classification societies would increase their risk management costs and rebound in higher fees charged to the societies' clients throughout the maritime industry. Whether such risk-spreading is

8

cost-efficient in an industry with well-developed legal duties and insurance requirements is doubtful. The distinctions articulated in caselaw to date recognize the care with which claims against classification societies must be studied.

After noting this essential caveat, we proceed to the merits of the case. To prevail on a cause of action for negligent misrepresentation under section 552 of the Restatement (Second) of Torts, Otto Candies had to establish that (1) NKK, in the course of its profession, supplied false information for Otto Candies's guidance in a business transaction; (2) NKK failed to exercise reasonable care in gathering the information; (3) Otto Candies justifiably relied on the false information in a transaction that NKK intended to influence; and (4) Otto Candies thereby suffered pecuniary loss. Coastal (Bermuda) Ltd., supra at 428-29 (citing Grass v. Credito Mexicano, S.A., 797 F.2d 220 (5th Cir. 1986)).

Additionally, a plaintiff claiming negligent misrepresentation must be a "person, or a member of a 'limited group' of persons, for whose benefit and guidance the defendant either intends to supply the information or knows that the recipient intends to supply it." Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 318 (quoting Scottish Heritable Trust, PLC v. Peat Marwick Main & Co., 81 F.3d 606, 612 (5th Cir. 1996)). Thus, Otto Candies must establish that NKK provided the class certificate to Diamond and knew that Diamond

intended it for Otto Candies's guidance and benefit.[3]

This is because "[t]he Restatement expressly limits liability to a select group of nonclients who the misinformer <u>actually knows</u> will receive inaccurate information . . . ." <u>First Nat'l Bank of Commerce v. Monco Agency Inc.</u>, 911 F.2d 1053, 1061 (5th Cir. 1990) (emphasis added). The fact that it was merely possible or foreseeable that a nonclient of the information supplier would rely on the information is insufficient. <u>Scottish Heritable Trust, PLC</u>, 81 F.3d at 612; <u>First Nat'l Bank of Commerce</u>, 911 F.2d at 1059-60. Furthermore, the information supplier's liability under section 552 is limited to those persons whom the engagement is intended to benefit. <u>First Nat'l Bank of Commerce</u>, 911 F.2d at 1059; <u>Bily v. Arthur Young & Co.</u>, 834 P.2d 745, 769 (Cal. 1992).

Diamond engaged NKK to certify the SPEEDER pursuant to the terms of the MOA, and the court found that NKK was aware (1) that its certification of the SPEEDER was directly related to the pending sale of the SPEEDER to Otto Candies and (2) that the certification would be used to guide Otto Candies's decision to buy the SPEEDER. NKK challenges these findings as clearly erroneous. They are not.

The district court admitted into evidence written correspondence from James Aitkenhead, a ship broker, to Otto

---

[3] Neither party contends that NKK directly provided the certificate to Otto Candies.

Candies directly supporting the court's findings. Aitkenhead's communications reveal that NKK was aware of the pending sale of the ship; that NKK's reclassification of the SPEEDER free of recommendations was a condition of the agreement under which the SPEEDER was to be sold; and that Otto Candies's purchase of the SPEEDER would be based on NKK's classification of the ship free of recommendations.

NKK argues that the correspondence is inadmissible hearsay and that the correspondence was withdrawn after being offered and was not admitted into evidence. NKK's argument is baseless. According to NKK, the Index to Otto Candies's trial exhibits indicates the correspondence was not admitted. On the contrary, the copy of the index found in the record notes that the district court admitted the exhibits at issue into evidence during the first day of the bench trial.

Additionally, despite NKK's representations to this court, there is no indication in the record that NKK objected at trial to the documents at issue. For the first time in its reply brief, however, NKK objects, but it furnishes no legal analysis supporting its argument that the correspondence is hearsay. Thus, any argument NKK may have had is waived. <u>Cavallini v. State Farm Mut. Auto Ins. Co.</u>, 44 F.3d 256, 260 (5th Cir. 1995) (issues first raised in a reply brief will not be considered).

11

NKK also argues that it could not have known that its certification report would be supplied to Otto Candies because it had no direct communication with Candies. Direct communication is unnecessary. Section 552 requires instead that the information supplier actually know the parties to whom and for whose explicit guidance the information is to be supplied.

The mere foreseeability that third parties may rely on such reports or certificates is also insufficient for purposes of section 552. See First Nat'l Bank of Commerce, 911 F.2d at 1061 (the Restatement explicitly limits an information supplier's liability to third parties the supplier "actually knows" will receive the information and will be influenced in their decisions regarding a business transaction). Comments to section 552 make clear that even parties that customarily rely on certain information are not entitled to bring a section 552 claim unless the information supplier knew at the time it supplied the information that it was for their benefit and guidance.[4] As the

---

[4] See, e.g., the following illustrations:

10. A, an independent public accountant, is retained by B Company to conduct an annual audit of the customary scope for the corporation and to furnish his opinion on the corporation's financial statements. A is not informed of any intended use of the financial statements; but A knows that the financial statements, accompanied by an auditor's opinion, are customarily used in a wide variety of financial transactions by the corporation and that they may be relied upon by lenders, investors, shareholders, creditors, purchasers and the like, in numerous possible kinds of transactions. In fact B Company uses the financial statements and accompanying auditor's opinion to obtain a loan from X Bank. Because of A's negligence, he issues an unqualifiedly favorable opinion upon a balance sheet that materially misstates the financial position of B Company, and through reliance upon it X Bank suffers pecuniary loss.

California Supreme Court notes:

> [b]y confining what might otherwise be unlimited liability to those persons whom the engagement is designed to benefit, the Restatement rule requires that the supplier of information receive notice of potential third party claims, thereby allowing it to ascertain the potential scope of its liability and make rational decisions regarding the undertaking.

Bily, 834 P.2d at 769. Thus, in this context, we reject any implication that classification societies can be liable for negligent misrepresentation to parties, including without limitation seamen, longshoremen, passengers, cargo owners, and charterers that may rely upon a survey or class certificate, absent actual knowledge by the classification society that the certificate or survey report was being provided for the guidance and benefit of the party.

We conclude that Otto Candies is eligible to bring a negligent misrepresentation claim against NKK under the facts of this case because NKK actually knew at the time it reclassified the SPEEDER that the results of the classification survey were to be conveyed to Otto Candies for the purpose of influencing its

---

A is not liable to X Bank.

12. In 1934, A Company, a firm of surveyors, contracts with B to make a survey and description of B's land. A Company is not informed of any intended use of the survey report but knows that survey reports are customarily used in a wide variety of real estate transactions and that it may be relied upon by purchasers, mortgagees, investors and others. The survey is negligently made and misstates the boundaries and extent of the land. In 1958 C, relying upon the report that B exhibits to him, purchases the land from B, and in consequence suffers pecuniary loss. A Company is not liable to C.

Restatement (Second) of Torts § 552 cmt. h, illus. 10, 12 (1977).

13

decision to purchase the SPEEDER.  The remaining issues are whether the district court clearly erred in finding that NKK supplied false information to Otto Candies, that NKK failed to exercise reasonable care in gathering the information, that Otto Candies reasonably relied on the information, and that as a result of relying on the false information Otto Candies suffered pecuniary loss.

The district court found that NKK provided false information by issuing a class certificate free of recommendations in light of the various defects in the hull and machinery of the SPEEDER.  NKK argues that the district court clearly erred in making this finding.  We disagree.

Before a classification society issues a class certificate free of recommendations, it must be satisfied that the certified vessel complies with the society's rules and standards for ships of the relevant class.  See Machale A. Miller, Liability of Classification Societies from the Perspective of United States Law, 22 Tul. Mar. L.J. 75, 77-81 (1997) (describing the class certification process).  By issuing a class certificate free of recommendations, a classification society necessarily represents that the vessel so complies.  Cf. Great Am. Ins. Co. v. Bureau Veritas, 338 F. Supp. 999, 1011-12 (S.D.N.Y. 1972) (when a society undertakes to classify a vessel it accepts a duty to survey and classify the vessel in accordance with society's own rules and standards), aff'd, 478 F.2d 235 (2d Cir. 1973).  The certificate or survey in no way guarantees a vessel's seaworthiness, however, but

14

extends only as far as the nature of the survey performed.

In this case, expert witnesses presented by both parties testified that the various items of damage and deterioration found by Stroubakis were relevant to and would affect the SPEEDER's NKK classification. Ian Smith, NKK's expert witness, testified that the deficiencies of the type noted by Stroubakis should be noted by a surveyor performing a class survey. Furthermore, Ben Haveman, Otto Candies's expert witness, testified that the various deficiencies should have been addressed during NKK's certification process. Based on their testimony, the fact finder could reasonably infer that NKK's certification of the SPEEDER free of recommendations constituted false information because the SPEEDER did not comply with the society's rules and standards for classification at the time of the survey. Thus, the district court did not clearly err in finding that NKK provided false information.[5]

Haveman's testimony also sufficiently supports the district court's finding that NKK failed to exercise reasonable care in gathering the information relevant to the SPEEDER's certification. Haveman testified that the NKK surveyor should have found the various deficiencies in the SPEEDER's hull and machinery

---

[5] NKK is not being held liable, as it contends, for the vessel's failure to satisfy ABS standards after being shipped to the U.S.

– many of them open and obvious – that Stroubakis discovered during his inspection.

NKK also challenges the district court's finding that Otto Candies actually and justifiably relied on the false information. We hold that the district court did not err in making this finding. Otto Candies, Jr., the chief executive officer of Otto Candies, L.L.C., testified that but for NKK's certification of the SPEEDER as a coastal passenger vessel free of recommendations, the company would not have purchased the SPEEDER. Furthermore, the district court did not err in finding Otto Candies's reliance on the certificate to be reasonable. NKK is one of the world's largest classification societies. In addition, NKK is a member of the International Association of Classification Societies ("IACS") which prescribes certain minimum standards for classification societies. Only eleven of the world's fifty classification societies qualify for membership in IACS. Machale A. Miller, supra, 22 Tul. Mar. L.J. 75, 77 n.6 (1997).

Finally, NKK argues that the district court erred in finding that Otto Candies suffered pecuniary loss as a result of the false information. The district court awarded Otto Candies as damages the cost to repair the deficiencies noted by Stroubakis. Whether this is a proper measure of damages is uncertain, but because NKK did not brief its reasons for contesting the damage award, the contention is waived.

16

## CONCLUSION

Based on the foregoing discussion, we agree with the district court that Otto Candies could properly bring a negligent misrepresentation claim against NKK and that the district court did not clearly err in finding that NKK was liable for negligent misrepresentation. The judgment is **AFFIRMED.**

17