United States Court of Appeals
Fifth Circuit

**F I L E D**

September 7, 2006

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 05-20862

HELLENIC INVESTMENT FUND, INC.

Plaintiff-Appellant,

versus

DET NORSKE VERITAS; DET NORSKE VERITAS (USA), INC.; DET NORSKE
VERITAS CERTIFICATION, INC.

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, DENNIS, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

In this maritime action, the plaintiff appeals from the district court's dismissal pursuant to a

forum-selection clause. Because the district court correctly enforced the forum-selection clause, we

affirm.

## I. FACTS AND PROCEEDINGS

1.     **Facts**

Hellenic Investment Fund, Inc. ("Hellenic"), a ship-owning consortium, purchased a ship, the

- 1 -

m/v MARIANNA, from another ship-owning company, Inlet Navigation Company ("Inlet"). At all relevant times, *i.e.*, before, during, and after the purchase, the MARIANNA was classed by Det Norske Veritas A/S ("DNV"), an internationally recognized classification society.[1] Before the purchase, Inlet had contracted with DNV to provide class-related inspections and certification; following the purchase, DNV continued to provide the same services to Hellenic.

Hellenic and Inlet entered into a Memorandum of Agreement ("MOA") for the purchase of the MARIANNA. The MOA designated DNV as the classification society for the vessel. According to the MOA, Hellenic received and inspected the MARIANNA's classification records, which were issued by DNV. Under the header of the MARIANNA's DNV classification certificate appear the words: "Issued under the provisions of the Rules of Det Norske Veritas." In negotiations, Hellenic, through an agent, obtained the MARIANNA's class status report, which DNV also prepared. Hellenic also reviewed other classification documents, prepared by DNV, relating to the MARIANNA's condition and class status.

The DNV classification status report indicated that the MARIANNA was current with her inspections but that several inspections were coming due before the anticipated purchase date. The MOA provided that "[o]n delivery vessel will maintain her class, free of recommendations and average damages affecting class." The MOA further provided that "[a]ll class trading certificates—national and international[—are] to be on delivery clean and valid and unextended for at least six (6) months." Accordingly, the soon-to-expire class inspections had to be performed as a condition of the MARIANNA's sale. Before the scheduled delivery date, DNV conducted surveys

---

[1]The other defendants in the district court action were dismissed for other reasons; there is no appeal of those dismissals.

on the MARIANNA and performed additional tests to ascertain the MARIANNA's condition.

After completing the necessary inspections, DNV prepared a confirmation of class certificate. Inlet's agent sent the certificate, by facsimile, to Hellenic's agent with instructions to provide the certificate to Hellenic. The certificate verified the MARIANNA's class as a 1A1 Bulk Carrier and provided that "[a]ccording to [DNV's] records, neither overdue Periodical Surveys nor any outstanding Conditions of Class are recorded against the vessel at present." In reliance upon DNV's issuance of the clean class confirmation certificate, Hellenic purchased the MARIANNA from Inlet the same day the confirmation of class was issued. Hellenic renamed the vessel the m/v TRANQUILLITY, and DNV, as the classification society, amended her class certificates to reflect the new name and ownership structure.

On the day of the purchase, inspectors from Hellenic's insurers (the "P&I Club") inspected the MARIANNA as a precursor to coverage. The P&I Club's inspection, Hellenic maintains, revealed several deficiencies, which should have been revealed by the DNV inspections. According to Hellenic, these deficiencies caused problems in obtaining coverage for an imminent voyage. Nevertheless, Hellenic operated the TRANQUILLITY on at least two voyages after the purchase. Additional concerns with the TRANQUILLITY's condition were discovered upon a port-state control inspection in Montreal, Canada. As a result of the subsequent arrest by port-state authorities, Hellenic sold the TRANQUILLITY.

## 2. Proceedings

Hellenic, believing that the defects noted by the P&I Club inspectors and the port-state control authorities predated DNV's confirmation of class certificate, brought suit against DNV for fraudulent misrepresentation pursuant to this court's holding in *Otto Candies, L.L.C. v. Nippon Kaiji Kyokai*

*Corp.*, 346 F.3d 530 (5th Cir. 2003) (holding that general maritime law recognizes the tort of negligent misrepresentation as applied to classification societies). Hellenic based its claims on DNV's representations in the MARIANNA's classification documents.

DNV sought to enforce a forum-selection clause, contained in DNV's Rules, and moved the district court to dismiss the action. The DNV forum-selection clause provides that "[a]ny dispute arising in relation to or as a consequence of these Rules shall only be resolved by the courts of Norway, the Municipal Court of Oslo being the proper venue." The district court determined that Hellenic was aware that DNV was the MARIANNA's classification society and that DNV would be conducting the inspections and issuing the certification on which the evaluation of the vessel and the consummation of the purchase depended. As a result, the district court determined that Hellenic was bound by the terms of DNV's Rules and dismissed the action.

## II. STANDARD OF REVIEW

When reviewing a district court's ruling on whether the terms of forum selection bind a non-signatory, this court reviews findings of fact for clear error and conclusions of law de novo. *See Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 353 (5th Cir. 2003) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 947–48 (1995)). This court considers a district court's decision to enforce a forum-selection clause to be an issue of law, which is reviewed de novo. *MacPhail v. Oceaneering Int'l, Inc.*, 302 F.3d 274, 278 (5th Cir. 2002) (citing *Afram Carriers, Inc. v. Moeykens*, 145 F.3d 298, 301 (5th Cir. 1998)).

## III. DISCUSSION

The parties do not dispute that, after the purchase of the MARIANNA, when DNV rendered documentation services, Hellenic was in a contractual relationship with DNV and bound by the

forum-selection clause. Nor is there any question that, before the purchase, Hellenic had no written, binding agreement with DNV relating to the MARIANNA's classification. Nevertheless, DNV contends that, although not a signatory to the DNV-Inlet contract, Hellenic should be bound by the contract's forum-selection clause. Hellenic argues that enforcement of the forum-selection clause would be unreasonable under the circumstances.

## 1.    Estoppel

This court has stated that "[a]rbitration agreements apply to nonsignatories only in rare circumstances." *Bridas*, 345 F.3d at 358.

> Nevertheless, federal courts have held that so long as there is *some* written agreement to arbitrate, a third party may be bound to submit to arbitration. Ordinary principles of contract and agency law may be called upon to bind a nonsignatory to an agreement whose terms have not clearly done so. Six theories for binding a nonsignatory to an arbitration agreement have been recognized: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary.

*Id.* at 355–56 (internal citations omitted). Before the district court, DNV argued that Hellenic was bound by the forum-selection clause under the following theories: estoppel, third-party beneficiary, and implied-in-fact contract. We hold that an estoppel theory, specifically direct-benefit estoppel, is sufficient to bind Hellenic to the forum-selection clause in the DNV-Inlet contract and, therefore, limit our discussion to that argument.[2]

Direct-benefit estoppel "involve[s] non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to

[2]Accordingly, we take no position on whether any other theory might bind Hellenic to the DNV forum-selection clause in these circumstances.

repudiate the arbitration clause in the contract." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 (3d Cir. 2001). The direct-benefit estoppel doctrine "applies when a nonsignatory 'knowingly exploits the agreement containing the arbitration clause.'" *Bridas*, 345 F.3d at 361–62 (quoting *DuPont*, 269 F.3d at 199). In *Bridas*, the court declined to apply direct benefit estoppel, stating that "it is undisputed that the [non-signatory] Government has not sued [signatory] Bridas under the agreement." *Id.* at 362. The court thereby distinguished situations such as Hellenic's, in which "the nonsignatory had brought suit against a signatory premised in part upon the agreement." *Id.* In these cases, "the courts seriously consider applying direct benefits estoppel." *Id.* The misrepresentations alleged in Hellenic's complaint all stem from "the various Certificates issued by DNV setting forth the condition of the M/V MARIANNA based upon DNV's surveys." Hellenic's claims, therefore, are, at a minimum, "premised in part" on the DNV Rules. *Bridas*, 345 F.3d at 362. We therefore need not concern ourselves with the distinction in *Bridas*.

Hellenic argues that direct-benefit estoppel is inapplicable because (1) Hellenic received no benefit from DNV's services, and (2) Hellenic is advancing a negligent misrepresentation claim, not a contract-based claim. We disagree.

In *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, the Second Circuit employed direct-benefit estoppel to bind non-signatory vessel owners to a forum-selection clause in a contract between a classification society and a shipyard. 170 F.3d 349, 353 (2d Cir. 1999). The relevant facts and relationships present in the instant case closely resemble those in *Tencara*. In *Tencara*, the owners entered into a construction contract with the shipyard. *Id.* at 351. Part of that agreement provided that the vessel be constructed to attain class according to the guidelines and standards of

the classification society. *Id.* In order to obtain the services of the classification society, the shipyard entered into a contract with the society. *Id.* The agreement between the shipyard and the society—to which the ownership group was not a party—provided for arbitration in New York in the event of a dispute under the contract. *Id.* The vessel was approved for class and delivered to the owners. *Id.* After the delivery, the vessel suffered significant damage, which was deemed to be a result of poor design and construction. *Id.* On the basis of its inspection, approval, and classification of the vessel, the classification society was sued in France by the owners and the underwriters and in Italy by the shipyard. *Id.* The society brought an action in federal court to compel arbitration in New York pursuant to the arbitration clause in the shipyard-classification society contract. *Id.* at 351–52. The owners and underwriters resisted arbitration by pointing out that they were not signatories to the contract with the arbitration clause. *Id.* at 352.

The Second Circuit held that the owners and underwriters were bound by the arbitration clause under a theory of direct-benefit estoppel. *Id.* at 353. According to the *Tencara* court, that the owners were able to insure the vessel more cheaply and sail under a French flag were sufficient benefits, directly flowing from the performance of the contract between the shipyard and the classification society, to bind the non-signatory owners to the contract's arbitration clause. *Id.* The situation in the instant case is no different.

1. **Benefit from the contract**

Despite Hellenic's claim that it did not benefit from the contract between Inlet and DNV, the record shows otherwise. Even adhering to Hellenic's version of events, Hellenic benefitted from DNV's performance of the contract. In the MOA, Hellenic specifically acknowledged receiving and reviewing classification documents that expressly refer to the DNV Rules: The key document, the

classification certificate, provided that it was "[i]ssued under the provisions of the Rules of Det Norske Veritas." The MARIANNA had to be in class, and expiring inspections had to be updated; both were conditions of the MARIANNA's sale under the MOA. Hellenic specifically admitted before the district court that "without . . . that condition of class [certificate], we wouldn't have done the deal." And Hellenic was aware that the inspections and documentation—both pre- and post-sale—were to be performed by DNV. This too was conceded to the district court: "Clearly, Judge, we knew that the ship was classed with DNV because of the certificates that we were being given to review. And we needed that last [confirmation of class] certificate, by the way, before we could have gone through with the deal." Further, Hellenic does not dispute that the MARIANNA's ability to be flagged and operate in commerce was founded on DNV's classification. It is clear that many benefits flowed directly to Hellenic when DNV performed its contract with Inlet.

While Hellenic retrospectively maintains that DNV's assurances and classification services ultimately proved to be of little benefit to Hellenic, there is no denying, indeed it is specifically admitted, that, at the critical moment of sale, DNV's performance was essential to Hellenic's decision to purchase the MARIANNA. Any lingering doubt whether Hellenic garnered a benefit from DNV's performance of the DNV-Inlet contract is erased by Hellenic's own statements in its complaint: "DNV knew, or should have known," that its representations "were intended for [Hellenic]'s *guidance and benefit* in a business transaction."

The very nature of the claim brought requires that DNV's performance under the contract be for Hellenic's benefit. An element of the cause of action under *Otto Candies* is the requirement that the classification society must have "in the course of its profession, supplied false information for [the vessel purchaser's] *guidance* in a business transaction." 346 F.3d at 535 (emphasis added). The *Otto*

*Candies* court later noted that "a plaintiff claiming negligent misrepresentation must be a 'person, or a member of a limited group of persons, for whose *benefit and guidance* the defendant either intends to supply the information or knows that the recipient intends to supply it.'" *Id.* (quoting *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 318 (5th Cir. 2002)) (emphasis added); *see also id.* at 536 ("Furthermore, the information supplier's liability . . . is limited to those persons whom the engagement is intended to *benefit*.") (emphasis added). Having stated a claim that expressly requires that DNV's performance be for Hellenic's benefit, Hellenic cannot avoid the estoppel implications of its position.

Regardless of any benefit, Hellenic maintains that it cannot be bound by the forum-selection clause because it has not asserted contractual claims. Although sounding in tort, Hellenic's claim is based upon DNV's failure to follow its own Rules in classing the MARIANNA. *See Stolt Parcel Tankers Inc. v. Det Norske Veritas AS*, No. 00-CV-1335, slip op. at 8–9 & n.4 (S.D. Tex. July 3, 2001), (enforcing an identical DNV forum-selection clause and noting that the "[non-signatory]'s action in this case is essentially founded upon its claims that DNV did not comply with its rules and should be liable to [the non-signatory] for damages"), *aff'd*, 45 F. App'x 323 (5th Cir. 2002) (adopting the district court's reasoning). Accordingly, if Hellenic has a claim for DNV's misrepresentation, it is only because DNV failed to adhere to its Rules when it classed the MARIANNA as a 1A1 Bulk Carrier.[3]

_____

[3]DNV's classification certificate plainly indicates that the MARIANNA had been inspected and approved according to the DNV Rules: "THIS IS TO CERTIFY that the [MARIANNA] has been surveyed by Det Norske Veritas according to the Society's Rules and that . . . the Society is satisfied that the condition of the [MARIANNA] was in compliance with the applicable Rule

**2.     DNV Rules**

The DNV Rules establish the standards of classification, the method of inspection, and the procedure for certifying class; these Rules also contain the forum-selection clause. The duty owed by DNV to Hellenic based on DNV's alleged misrepresentations arose from the DNV Rules. Hellenic's claim based on DNV's failure to perform in accord with its Rules is therefore subject to the Rules' forum-selection clause. Hellenic cannot embrace the Rules by bringing a claim under *Otto Candies* alleging, in essence, a violation of the DNV Rules without accepting the consequence of those Rules. *See DuPont*, 269 F.3d at 200; *Tencara*, 170 F.3d at 353; *Stolt*, No. 00-CV-1335, slip op. at 8–9. Hellenic is estopped from denying the entire contract, including the forum-selection clause. We hold that Hellenic is bound by the DNV forum-selection clause.

**3.     Enforceability**

Hellenic's final argument is that the forum-selection clause is unenforceable. Hellenic looks to *M/S BREMEN v. Zapata Off-Shore Co.* for the proposition that, although forum-selection "clauses are prima facie valid," they should not be enforced if "enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." 407 U.S. 1, 10 (1972). Hellenic contends that the forum-selection clause is unenforceable because it was not a negotiated term between Hellenic and DNV. Both the Supreme Court and this court have rejected the argument that "a nonnegotiated forum clause . . . is never enforceable simply because it is not the subject of bargaining." *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593 (1991); *see also Mitsui & Co. (USA), Inc. v. MIRA M/V*, 111 F.3d 33, 36–37 (5th Cir. 1997) (holding that a commercial entity was bound by a bill of lading that included an "unnegotiated forum selection clause"). Hellenic's claim that the forum-

requirements."

- 10 -

selection clause was unmentioned in the classification certificate was rejected by the district court, which found that Hellenic was on notice of the applicability of the DNV Rules. Hellenic has provided no basis to upset that finding. Nor has Hellenic advanced a sound rationale to overcome the presumption that federal courts "must enforce forum selection clauses in international transactions." *Haynsworth v. The Corporation*, 121 F.3d 956, 962 (5th Cir. 1997); *see also Stolt*, No. 00-CV-1135, slip op. at 10 (enforcing an identical DNV forum-selection clause). Accordingly, we find the DNV forum-selection clause enforceable under these circumstances.

## IV.  CONCLUSION

The district court correctly enforced the forum-selection clause in dismissing the action. We AFFIRM.